CHARLES RICARDO, et al., Plaintiffs

v.

DANIEL W. AMBROSE, Government Secretary, Defendant

Civil No. 246 - 1952

District Court of the Virgin Islands

Div. of St. Thomas and St. John
at Charlotte Amalie

March 16, 1953

*See, also, 110 F. Supp. 716.*

*Same case on appeal, see 3 V.I.*

DUDLEY, HOFFMAN AND MCGOWAN, Charlotte Amalie, St. Thomas, Virgin Islands (GEO. H. T. DUDLEY, Charlotte Amalie, St. Thomas, Virgin Islands, of counsel), *for plaintiffs*

CYRIL MICHAEL, United States District Attorney, Charlotte Amalie, St. Thomas, Virgin Islands (IRWIN W. SILVERMAN, Chief Counsel, Office of Territories, Dept. of Interior, Washington, D. C., of counsel), *for defendant*

MOORE, *Judge*

An interpretation of the real property tax laws of the Municipality of St. Thomas and St. John is here involved. The first real property tax law, under American rule, for the Municipality of St. Thomas and St. John was an ordinance of January 12, 1922. This ordinance was superseded by Act of Congress on May 26, 1936 (ch. 450, 49 Stat. 1372), 48 U.S.C. §§ 1401 - 1401e, which Act was followed by regulations promulgated thereunder, December 31, 1936. Plaintiffs now ask the Court for interpretation of, and declaratory judgments respecting several sections of the above-mentioned regulations, to wit: sections 4, 14, 25, and 35, and, also, that the Court set aside the assessment schedules prepared during the months of January to June, 1952, and enjoin the collection of taxes levied on said assessments as the taxes for the calendar year 1951. Plaintiffs contend that the procedure adopted by the employees of the municipality is not in accord with the meaning of the statute and regulations; that the tax assessor, who is responsible to the Government Secretary, has violated the provisions of the regulations and that said violations invalidate the assessment, at least insofar as it applies to the year of 1951; and that they, petitioners, have no adequate remedy at law.

The defendant argues that this tax should not be enjoined because it was levied and assessed in substantial compliance with the regulations of 1936, and that, even if such irregularities as claimed were proved, they are not such as to invalidate the tax on the ground of illegality. Defendant further argues that an injunction to restrain the assessment or collection of a tax is prohibited by section 3652 of Title 26, U.S.C., and, also, that the legal remedy of plaintiffs is adequate.

In the first instance, it is necessary for the Court to decide the issues raised as to the *legality* of the levy and assessment of the tax in question. The most important issue here is: to what year did Congress intend the first levy and assessment under its Act of 1936 to apply? And next, does the procedure specified by the regulations carry out this intention of Congress?

Prior to, and including, the year 1935 the real property tax on real estate in the municipality of St. Thomas and St. John was one per cent. In 1936 the Governor made an effort to get the Colonial Council to raise the rate from one per cent to one and one-quarter per cent applicable to the taxes for 1936, payable on June 30, 1937, which the Council refused to do. Upon the refusal of the Colonial Council so to act upon this matter, an appeal was made by the Governor and the Department of Interior to the United States Congress to enact a tax statute for the islands. Accompanying this proposal, a memorandum was submitted to Congress by the Department of Interior on April 2, 1936, in which it was stated that:

"The urgency of action is further emphasized by the fact that assessments must be made within the next month for local taxes to be collected in 1937. Thus, unless this bill is passed immediately the Municipalities will not receive the additional revenue therein provided until 1938."

By this it was meant that the statute changing the tax rate must be passed early in 1936 in order that assessment at the new rate might be made in time to allow the 1936 taxes to be collected by June 30, 1937. This was in line with the procedure followed under the existing tax ordinance of 1922, section 52 of which provided as follows:

"The taxes imposed by Section 1 of this Ordinance shall be payable annually on or before June 30, of each year, and for the first

time on or before the 30th day of June, nineteen hundred and twenty-three for the calendar year 1922."

The procedure here set forth has been the procedure constantly followed by the taxing authorities each year until 1936 when the above request was made to Congress that they act promptly so that the 1936 taxes to be assessed and collected in 1937 should bear the one-quarter per cent increase.

The Act of Congress, as passed on May 30, 1936, clearly and definitely declares that the levy at the new rate shall commence with the year 1936. The pertinent sections of the Act are herewith quoted:

"For the calendar year 1936 and for all succeeding years all taxes on real property in the Virgin Islands shall be computed on the basis of the actual value of such property and the rate in each municipality of such islands shall be the same for all real property subject to taxation in such municipality whether . . . such property is in cultivation and regardless of the use to which such property is put.

"Until local tax laws conforming to the requirements of sections 1401-1401e of this title are in effect in a municipality the tax on real property in such municipality for any calendar year shall be at the rate of 1.25 per centum of the assessed value. If the legislative authority of a municipality failed to enact laws for the levy, assessment, collection, or enforcement of any tax imposed under authority of said sections, within three months after May 26, 1936, the President shall prescribe regulations for the levy, assessment, collection, and enforcement of such tax, which shall be in effect until the legislative authority of such municipality shall make regulations for such purposes." Ch. 450, sections 2 and 3, 49 Stat. 1372, 48 U.S.C. §§ 1401a, 1401b.

Following this Act of Congress, the Colonial Council took no action within the three months allowed by Congress from May 26, 1936, and consequently, regulations pursuant thereto were issued by the President on December 31, 1936. The date of the regulations promulgated by the President made it necessary that the 1936 taxes

271

be assessed in 1937, and, therefore, both the Congressional Act and regulations continued the time of assessment and collection as previously established by the Ordinance of 1922, changing only the rate of taxation from one per cent to 1.25 per centum. Thus, since the passage of the Colonial Council's Ordinance of January 12, 1922, all taxes in the municipality have been collected on June 30th of each year for the preceding calendar year up to and including the year in question, to wit: 1951.

Counsel for the plaintiffs base their argument to declare the 1951 tax illegal, mainly and principally upon section 14 of the regulations issued by the President on December 31, 1936, pursuant to the Act of Congress of May 26, 1936, and which section reads as follows:

"The assessment of property, as the same appears on the tax-roll last prepared, shall, after it has been corrected, amended and revised, as herein provided for, constitute the tax roll for the next calendar year. As soon after January fifteenth of each year, and not later than March thirty-first, it shall be the duty of the assessor to fill out an assessment schedule showing in detail each separate piece of real property and improvement thereon, subject to taxation within the Municipality, belonging, on January fifteenth, to each taxable person whose property, in the opinion of the assessor, should be revalued or reassessed for purposes of taxation, or the revaluation of which has been requested by the owner thereof or by the Municipal authorities of the Municipality, or by any property owner. The assessment roll shall be open to public inspection at any time. . . ."

Counsel's argument is to the effect that the words "next calendar year" used in the first sentence of this section means the next calendar year after the doing of the things mentioned in the second sentence of the same section, that is to say, that the assessments made during January to March of any year shall be the tax for the next calendar year after the said January to March in which the assessment is made.

It is further argued that the words "next calendar year" also means the next calendar year after the words, "corrected, amended, and revised as herein provided." This results, however, in the same argument because the new assessment for any year, in accordance with the regulations, is made up by taking the last assessment roll and then "correcting," "amending," and "revising" it to show new valuations, additions, and subtractions to properties subject to taxation in the new assessment, and when these corrections, amendments and revisions are completed in accordance with section 14, the then corrected, amended, and revised assessment becomes the new assessment.

▆ ▆ Now, let us consider counsel's argument that after this is done it becomes the assessment for the next calendar year after the doing thereof. Here counsel does not carry his argument to its logical conclusion. The assessment for 1951 was prepared between January and March of the calendar year 1952 and declared as the assessment for the calendar year 1951. Plaintiffs argue that this assessment made in January to March of 1952 cannot be the assessment for 1951, but that under section 14 of the regulations quoted above it can only be the assessment for 1952, overlooking the fact that 1952 is the same calendar year in which it was made and not the next calendar year. Since this assessment was made in the calendar year of 1952, if plaintiffs' argument were correct the next calendar year would mean 1953 and this would then have to be the assessment for the calendar year 1953, omitting both the years 1951 and 1952 from taxation. This argument would, therefore, mean that the 1936 taxes, authorized by Congress to be collected in 1937, should of necessity have been assessed in January to March of 1935 to be applicable to 1936, so also the 1937 taxes should of necessity have been assessed in January to March 1936, to have been applicable to 1937. Both of these were im-

273

possibilities, and if these regulations were so interpreted, the Act of Congress which clearly stated that it should apply to 1936 and subsequent years, would be a nullity as to those two years of 1936 and 1937 since the earliest assessment that could have been made after the congressional Act of May 26, 1936, and the issuance of the regulations by the President on December 31, 1936, would be the January to March assessment of 1937. At that time the year of 1936 was a *preceding* year, and the year of 1937 was the *same* year.

Further, this argument would mean that under plaintiffs' interpretation of the "next calendar year" all taxes for 1954 would have to be assessed in January to March of 1953 to be collectible in 1954; or that for any given year the taxes for that year must be assessed at least nine months before the beginning of the calendar year in question, at a time when no assessor can possibly know what will be the value or improvements upon said property in the next year.

The Court is of the opinion that the plaintiffs have placed a mistaken interpretation upon section 14 of these regulations, especially upon the first sentence, to wit: "The assessment of property, as same appears on the tax-roll last prepared, shall, after it has been corrected, amended, and revised, as herein provided for, constitute the assessment roll for the next calendar year."

If we consider the statement in the tax levy of 1952 and the procedure thereunder, the provision of Congress that the tax shall apply to 1936 and subsequent years; the fact that these regulations were drawn pursuant to, and not in derogation of the Act of Congress; the time allowed for the Colonial Council to act; its failure to act and the final promulgation of the regulations by the President on December 31, 1936; then, we come to the only logical interpretation of the regulation above and the only

274

one which is indicated from its very wording and punctuation, to wit: that the words "next calendar year" mean simply the *next calendar year after the tax roll last prepared*. The phrase "after it has been corrected, amended, and revised as herein provided for" is parenthetical and modifies the subject matter of the sentence, to wit: "The assessment of property as same appears on the tax-roll last prepared." Thus, the assessor is required to take the tax roll for the year last prepared, and then, in order to prepare the tax roll for the next calendar year after that one, he is required to do the things mentioned in the parenthetical phrase above. When the assessor has done the things mentioned in the parenthetical or qualifying phrase, then the new and amended roll becomes the assessment for the next calendar year after the last previous assessment. So that the assessment made in January to March, 1952, by taking the tax roll of 1950, the tax roll last prepared, and correcting, amending and revising it to show the valuations of the year just ended, became the assessment for 1951, the next calendar year after the tax roll last prepared.

Attention should also be called to the fact that these regulations themselves give the Government Secretary the power to cause assessments to be made at any time for property which may have been omitted from assessment any year beginning with 1936. This power is not restricted to any one piece of property but may include an assessment of all pieces. Consequently, if in 1952 the Government Secretary found no assessment against properties for the year of 1951, he has the power then to cause the assessor, in 1952, to make such assessment of each piece of property for the calendar year of 1951. The section of the regulations to this effect is as follows:

"Section 19. Whenever the Government Secretary shall learn that any real property liable to taxation has been omitted from

the assessment of property of any year or years, beginning with the year nineteen hundred and thirty-six, he shall immediately cause the same to be assessed for the years for which said property has not been assessed and to add the collection of the taxes corresponding to the same and all surcharges accruing on account of such taxes not having been paid in due time, in the manner prescribed by these Regulations. Provided, however, that where such property has not been assessed and taxed through no wilful default of the owner the Government Secretary shall have power in his discretion, to remit the surcharge, in whole or in part. . . ."

Congress clearly did not intend that anyone with property should escape taxation in any year, for section 19 makes it plain that, even if assessment under section 14 failed for some reason or was declared null and void, a later and subsequent assessment may be made at the direction of the Government Secretary. Therefore, under this section, property can be so assessed even after the year 1952 for any back years wherever there is no valid assessment. It is, in effect, a saving clause for any omissions under section 14.

Counsel for plaintiffs also challenges the legality of the assessment made in 1952 on the ground that the procedure specified in the regulations has not been followed by the tax assessor. The following deviations have been claimed:

(1) That the assessor had not prepared an assessment roll such as is contemplated by sections 14, 20, 28 of the regulations;

(2) That the individual assessment schedules were not grouped according to tax districts and endorsed by the defendant as directed by section 28 of the regulations;

(3) That by reason of the directive in section 20 of the regulations said "assessment roll" as defined by the assessor was not available to the general public for inspection "at any time" in violation of section 14 of the regulations;

276

(4) That the re-assessment was in the main made without prior inspection of the properties taxed;

(5) That in many instances the re-assessment was made without the required data on which a revaluation could be made;

(6) That the assessments in many cases were arbitrary and discriminatory.

To prove these irregularities in assessing and making up of the tax rolls, counsel called as his principal witness the tax assessor, who denied these allegations of plaintiffs. No other evidence was offered which proved them. Testimony was given by other witnesses who testified only to their lack of knowledge of the assessor having viewed their premises as is required by section 4, and, also, that they were unable to see the tax rolls during the period of January to April.

■ With respect to the first claim that the assessment roll prepared is not of the type contemplated by the regulations, it is the opinion of the Court that the assessment roll is merely the sum total of the assessments for each piece of property in any given year, whether the assessments are listed on separate sheets or in a bound book or scroll.

■ As to whether the individual assessment schedules were grouped according to tax districts and endorsed by the Government Secretary, it was testified by the tax assessor that the assessment schedules were classified into districts corresponding to the voting districts and the Government Secretary testified that his signature was placed on the back of each folder with a rubber stamp. Even if so broad a classification was not the type of grouping contemplated by the regulation, and even if a rubber stamp signature was not wholly in compliance with the requirement of section 28, these deviations are not such as to invalidate the assessment.

277

As to the tax rolls being accessible to view of taxpayers, there is only the testimony of two witnesses who asked for them while they were being prepared and were told that they were at the Government Secretary's office. There was no refusal to let them see them, nor was there any diligent effort on the part of these witnesses to see them. It must be remembered that, while the law gives taxpayers a right to see these rolls, the rolls also have to go constantly between two offices and to be used and worked on between the two offices while they are in the process of being prepared.

While some of the irregularities alleged would not be such as to invalidate the assessment, failure to view the property before making an assessment and failure to assemble the data required by section 5 of the regulations are more serious irregularities. There is no specific evidence in this case that the tax assessor did not view each piece of property in making said assessments, and there is the tax assessor's direct testimony, adduced by plaintiffs, that this was done. With respect to the basis for the valuations and assessments, there is no evidence, one way or the other, the tax assessor having testified that she does not now remember the basis for the evaluation of each piece of property and that she kept no writings or records of this. Nor was there any evidence of any weight or consequence presented with reference to the allegation that the assessments were in many instances arbitrary, capricious, and discriminatory.

If the irregularities listed above as 4, 5, and 6 had been proved, then plaintiffs may have established sufficient cause for invalidating the assessment.

Counsel also raised the question that Section 14 states that "as soon after January 15th of each year and not later than March 31st" it shall be the "duty" of the assessor to fill out assessment schedules. The point was

278

made that assessment schedules in the instant case were not completed on March 31st. The Court is of the opinion that this section defining the tax assessor's duty in no way relieves any taxpayer from the payment of his taxes on June 30th, for the preceding year, because of the lateness of his notice. We recognize that it causes the taxpayer an inconvenience, but, nevertheless, he is liable under the act to the tax on the date specified, apart from any disciplinary action which may be taken against the tax assessor. If, however, the assessment should not be received in time for the taxpayer to make his payments on June 30th, section 19 provides that the Government Secretary has the discretion of waiving penalties not accrued by reason of the fault of the taxpayer. This discretion rests wholly with the Government Secretary and is final unless abused.

■ Exact conformity with all of the provisions of these regulations is not necessarily a condition precedent to a valid tax. The test is said to be whether the particular provision is for the benefit and protection of the individual taxpayer or is merely for the orderly administration of public affairs. 51 Am. Jur. 618. It has been held that the collection of a tax will not be enjoined on account of defects, mistakes, irregularities or omissions of statutory requirements in the process of assessing, listing, and valuing the property, which are not of such a nature as to affect the substantial justice of the tax itself or work irreparable injury to the rights of complainant. King County, Wash. v. Northern Pac. Ry. Co., 9 Cir., 196 Fed. 323, 327; Mercantile Nat. Bank v. Hubbard, C.C., 98 Fed. 465, reversed 6 Cir., 105 Fed. 809, reversed 186 U.S. 458, 22 S. Ct. 908, 46 L. Ed. 1247; Albany City National Bank v. Maher, C.C., 6 Fed. 417, 19 Blatchf. 175.

In their complaint and argument plaintiffs asked for the following:

1. That the entire tax roll and assessments for the year 1951 be declared invalid.

2. That, if the tax in question be declared a valid one, it be declared the 1952 tax instead of the 1951 tax.

3. That, if neither of the above is done, this lawsuit be considered as an appeal from the decision of the Board of Tax Review on the part of the plaintiff who filed within the time for appeal, to wit: Charles Ricardo.

4. That the Court give a declaratory judgment as to the rights of taxpayers in this municipality under sections 4, 14, 25.

Plaintiffs' first request has been fully discussed in this opinion.

Plaintiffs' second request is also fully discussed in the opinion herein, although it might be added that the Court has no such jurisdiction or power so to do in either instance. For if the tax assessed for the year of 1951 is a valid assessment and tax for that year, then this court has no power to become assessor and arbitrarily declare it to be the assessment for any other year; and conversely, even if it were an invalid tax for the year of 1951, this court could not become the assessor for the year of 1952 and take a set of figures which were not valid for the year intended and declare them to be an assessment and tax for any other year. This court has no power of assessment and could go no further than to declare an assessment as either valid or invalid. Any new assessment must be made by the proper taxing authorities. Silverthau v. United States, D.C. Conn., 26 F. Supp. 242; Ventura Consol. Oil Fields v. Rogan, 9 Cir., 86 F.2d 149, certorari denied 300 U.S. 672, 57 S. Ct. 610, 81 L. Ed. 878.

As to plaintiffs' third request, only one of the plaintiffs filed any appeal from the Board of Tax Review within the time limit for appeal to this court. Some of them did not even go before the Board of Review. This complaint

was, therefore, clearly not intended to be an appeal from the decision of that board, as none of the plaintiffs offered any evidence of valuation of their respective properties upon which this court could consider actual values of property and make any determination of the true valuation of their properties. No witnesses with knowledge of the value of property in Saint Thomas were called to testify as to the true value of any of the properties in question or to show just where and how the board had erred in its valuation. The one plaintiff who filed his case within the time limit for appeal offered, in his behalf, only his own testimony that, in his opinion, the assessment on his property was too high.

Plaintiffs' fourth request has been taken care of by the discussion of the Court of the various sections of the regulations in controversy.

It being the opinion of the Court that the tax in question is a valid one for the year 1951, it is not necessary to go into the question of the power of this court to enjoin the collection of taxes since no injunction is to be granted.

Order, therefore, may be drawn in accordance with this opinion.